RYON R. PUETT, Appellant, v. WESTERN PACIFIC RAILROAD COMPANY, a corporation, Respondent.

No. 17764

March 30, 1988                          752 P.2d 213

*Wilson and Barrows,* Elko, for Appellant.

*Woodburn, Wedge, Blakey & Jeppson* and *Suellen Fulstone,* Reno, for Respondent.

## OPINION

*Per Curiam:*

Appellant Ryon Puett owns land subject to respondent Railroad's right of way. Puett contends that as owner of the servient estate, he has a right under the law to a private vehicular crossing over the Railroad's right of way. The Railroad claims that, pursuant to the federal act granting its right of way, Congress intended that the railroads have exclusive use and possession of the surface of the way; consequently, the Railroad contends that the appropriate remedy—both for Puett and as a matter of equity—is for the Railroad to issue a license to Puett. We agree with the Railroad and therefore affirm the summary judgment.

### Facts

Puett owns property located in Section 30, Township 33 North, Range 53 East, just outside Carlin in Elko County, Nevada. He traces his title to a Desert Land Entry Patent issued by the United States in 1930 to his predecessors in interest. In 1913 his grandmother, Myrtle Puett, originally filed an application under the Desert Land Entry Act for Section 30.

Puett's predecessor in interest acquired the property subject to the Western Pacific Railway Company's right of way (now, by merger, a division of the Union Pacific Railroad Co., hereafter "Railroad"). The Railroad acquired that right of way under the federal General Railway Right of Way Act of 1875 (codified at 43 U.S.C. §§ 934-39, hereafter "1875 Act").[1] The Railroad does

---

[1] The 1875 Act, in pertinent part, provides:

The right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of

not dispute Puett's contentions that in 1911 the Railroad built a crossing across its tracks when it traversed the Puett property, and that this crossing was continually used by him and his predecessors from 1913 to January of 1985.

No question was raised about the private use of the crossing until approximately September, 1982. At that time Puett came into the Railroad office in Elko to request upgrading of the existing crossing; Puett explained that he wanted to subdivide and develop his property south of the tracks for the purpose of creating a gravel business. The office, however, could not find any documentation allowing Puett to use the crossing, and Puett was unable to proffer any. As a result, the Railroad ordered the crossing removed. Subsequently, Puett made application for a road crossing at the site. The Railroad sent a licensing form which Puett rejected.

In November, 1982, Puett filed the instant action alleging his right to an easement for a grade crossing across the Railroad's right of way. Puett also filed for a preliminary injunction to restrain the Railroad from interfering with his use of the crossing. However, Puett failed to pursue his actions and the case was inactive for two years.

In February of 1985, Puett again moved for preliminary injunctive relief; the motion was denied. In its denial, the district court noted that the Railroad's right of way is an easement in perpetuity to exclusive use and possession, and that the property was acquired by Puett's predecessors after the Railroad had acquired its right of way. Consequently, the court concluded that Puett could not acquire a prescriptive easement against the Railroad. The court also suggested that Puett's remedy was limited to pursuing the Railroad's offer of a licensing agreement.[2]

In January 1986, Puett filed an action in federal district court (District of Nevada) seeking similar relief purportedly under a

---

any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

43 U.S.C.A. § 934 (West 1986).

[2]The Railroad has consistently offered to enter into a licensing agreement with Puett throughout this action. Puett, however, continues to reject the Railroad's offer.

different legal theory: a right to a grade crossing as an owner of the servient estate to the Railroad's right of way. Subsequently, Puett filed a motion for stay of proceedings in the Elko court pending a final determination by the federal court; the motion was denied. The Railroad moved for summary judgment and, pursuant to stipulation of the parties, Puett filed an amended complaint purportedly dropping all claims to an easement and asserting the theory proffered in the federal action.

The Railroad's motion for summary judgment was granted. Puett appeals, contending that as owner of a servient estate, he has a right under the law to a vehicluar grade crossing across the Railroad's right of way as it crosses his property.

*Discussion*

The right of way acquired by the Railroad under the 1875 Act is an easement; at the time of the grant, the fee or servient estate remained in the United States. Great Northern Railway Co. v. United States, 315 U.S. 262, 271, 276-77 (1941). Thus, in considering whether a right of way for an irrigation ditch and flume could be acquired by prescription against the right of way of a railroad (received via the 1875 Act), the Tenth Circuit in Himonas v. Denver & R.G.W.R. Co., 179 F.2d 171 (10th Cir. 1949), held:

> Since the Railroad Company did not own the fee, it could not dedicate or grant any part thereof, and no right in the servient estate could be acquired by prescription. Neither could the Railroad Company grant any part of its right of way for private use nor could adverse interests be acquired in such right of way for private use by prescription.

179 F.2d at 172-73. Following similar reasoning, the Tenth Circuit rejected a claim of adverse possession by a lumber company to the strips of land on each side of a railroad track. The court noted that the right of way received by the railroad under the 1875 Act precluded the lumber company from claiming the strips of land by reason of adverse possession, abandonment or estoppel. Boise Cascade Corp. v. Union Pac. R. Co., 630 F.2d 720 (10th Cir. 1980).

Puett, acknowledging that a railroad is prohibited from granting easements in its right of way, dropped all claims to an easement and advanced an alternative theory that as the servient owner of the land he has a *right* under the law to a vehicular grade crossing. A review of the case law supports the Railroad's claim that the 1875 Act intended railroads to have exclusive use

and possession of the surface right of way granted by the act. Although such a feature (exclusive use and possession) is not ordinarily associated with an easement as it existed at common law, the cases interpreting the 1875 Act demonstrate that the easements granted thereby were not intended to be construed within the traditional definition of an easement.

Indeed, before 1942, the nature of the Railroad's right of way was termed as a "limited fee," *See, e.g.,* Northern Pacific Ry. v. Townsend, 190 U.S. 267, 271 (1903). The Tenth Circuit explained that term as follows:

> The concept of "limited fee" was no doubt applied in *Townsend* because under the common law . . . an easement did not give an exclusive right of possession. With the expansion of the meaning of easement to include, as far as railroads are concerned, *a right in perpetuity to exclusive use and possession* the need for the "limited fee" label disappeared.

Wyoming v. Udall, 379 F.2d 635, 640 (10th Cir. 1967) (emphasis added). In Idaho v. Oregon Short Line R. Co., 617 F.Supp. 207 (D.Idaho 1985), the Idaho federal court set forth in some detail the history of federal railroad grants and the nature of the rights of way thus acquired. Again, as noted in *Udall,* the *Short Line* court brought attention to the "definitional problem" of the right of way granted to the railroads. In describing the efforts in the case law to define property interest conveyed to a railroad by grant of a right of way, the *Short Line* court reflected that the result was a "rather unartful coinage of the term 'limited fee with an implied condition of reverter,' something of a hybrid between a fee simple interest and a mere easement interest." 617 F.Supp. at 210. After reviewing the legislative history, statutes and cases dealing with the rights-of-way granted to railroads,[3] the Idaho court concluded that

> Congress, in granting the 1875 Act rights-of-way, did not intend to convey to the railroads a fee interest in the underlying lands. Congress did, however, intend to give the railroads an interest suitable for railroad purposes—a right-of-way, which, by definition, carried with it the right to exclusive use and occupancy of the land.

617 F.Supp. at 212.

An analogous situation to the instant case was presented in Denver & S.L. Ry. Co. v. Pacific Lumber Co., 278 P. 1022 (Colo. 1929). In *Pacific Lumber,* a lumber company sought an injunction to keep the railroad from interfering with the lumber

---

[3]This excellent review, which we see no need to duplicate in this opinion, is found at 617 F.Supp. at 210-12.

company's use of a crossing where the railroad's tracks passed through the company's patented land; a mandatory order compelling the railroad to reinstall the removed crossing was also sought. As in the instant case, the railroad had acquired its right of way via the 1875 Act *prior* to the lumber company's predecessor in interest acquiring the fee to the property. On those facts, the Colorado Supreme Court held that the lumber company had no right to a private crossing, noting that

> [S]o long as the defendant railway company maintains its line of road, *it has the right of exclusive use and possession of its right of way.*
>
> . . . *the owner of the servient estate has no right to occupy the surface* of the land conveyed for right of way, in any mode, or for any purpose, *without the railroad company's consent.*

278 P. at 1023-24 (emphasis added).

Puett suggests that, even if the Railroad has the right to exclusive use and possession of its right of way, "exclusive" contains an implied limitation to Railroad purposes which in turn permits the servient owner to use the right of way for other non-railroad uses which do not interfere with the Railroad's operation. The authorities cited by Puett do not support his claim.

For example, Puett places great reliance on Cincinnati, Hamilton & Dayton Ry. Co. v. Wachter, 70 N.E. 974 (Ohio 1904). In *Wachter,* a railroad sought to prevent a landowner from crossing the railroad's easement. The court held that there was a reserved right of the estate owner to cross the easement. However, the context of *Wachter* simply renders it inapposite to the instant case. *Wachter* arose out of a *private grant* of right of way to a railroad. None of the federal rights of way grants was involved; the issue in *Wachter* was the implied reservation in the grantor of a crossing easement. The *Wachter* court invoked the common law doctrine of easement by necessity to imply such an easement in the landowner. The United States Supreme Court has held that this common law doctrine is simply not applicable to grants from the federal government to the railroads. Leo Sheep Co. v. United States, 440 U.S. 668, 679-81 (1979).[4]

---

[4]In *Leo Sheep,* the United States claimed that, when odd-numbered sections of land had been conveyed to the railroad pursuant to the Union Pacific Act of 1862, it had reserved an implied easement in itself to cross those sections to secure access to its even numbered sections. The Tenth Circuit agreed. A unanimous Supreme Court reversed holding that the United States had no implied right either under the 1862 Act, the doctrine of easement by

Likewise, in urging this court to accept his theory, Puett relies on cases which involve the acquisition of *public* rights to use a railroad's right of way. As respondent Railroad concedes, there has never been any question that the right of way granted the private railroad companies are subject to the states' power of eminent domain.[5] Puett, however, wants to draw the analogy of public crossings to the exercise of private crossing rights in individuals. There is no authority supporting Puett's analogy.

Puett also argues that his theory finds support in Energy Transportation Systems, Inc. v. Pac. R. Co., 435 F.Supp. 313 (D.Wyo. 1977), *aff'd,* 606 F.2d 934 (10th Cir. 1979). In *Energy Transportation,* the fee owner of land (subject to a railroad's right of way) sought the right to construct an underground coal slurry pipeline which involved crossing the railroad's right of way beneath the surface. The court held for the landowner. Puett argues that *Energy Transportation* "stands for a much broader proposition" than the right of the servient owner to use the subsurface estate. We disagree. The court in *Energy Transportation* clearly limited its opinion to subsurface rights, noting:

> [Energy Transportation] asserts no rights to the surface of the railroad right of way, but seeks a declaration that the railroad has no right to prohibit [Energy Transporation] from using the surface at such depth and in such manner as not to interfere with the railroad's exclusive occupancy and use of the surface right of way.

435 F.Supp. at 317.

Finally, in denying Puett's request for injunctive relief, the district court determined that Puett's remedy "is to pursue the offered license agreement to obtain ingress and egress to his property." Respondent Railroad suggests that as a matter of equity, the district court was correct. We agree.

Respondent Railroad has licensed over 14,000 private grade crossings. A license requires the servient owner to pay for the crossing and provide insurance against the risk created thereby.

---

necessity or the Unlawful Enclosures of Public Lands Act. 440 U.S. at 680-85.

Pursuant to *Leo Sheep,* the United States retained no right of way as the fee owner of the land; consequently, neither does Puett possess such a right as the current fee owner.

[5]Indeed, in rejecting the idea that the government retained a common-law doctrine of easements by necessity when granting the railroad right of ways, the Supreme Court in *Leo Sheep* saw the power of eminent domain as an "obvious device for ameliorating disputes." 440 U.S. at 681.

Such an arrangement comports with equity: instead of placing the cost and risk of a private crossing upon the railroad (to be paid by the traveling public and consumers of goods shipped by rail), the expense is placed upon the private party who primarily uses and benefits from the crossing. A ruling in Puett's favor in effect entitles all other current servient owners of land, along the Railroad's track, to require the Railroad to bear the expense of maintaining and insuring any private crossings upon those lands; to pose such a financial burden on the Railroad is unwarranted and inequitable.

In granting railroads a right of way pursuant to the 1875 Act, Congress intended such railroads to have exclusive use and possession of the surface thereof. Hence, the district court was correct in ruling that, as owner of the servient estate, Puett does not have a right under the law to a private vehicular crossing. The appropriate remedy for Puett is a licensing agreement with the Railroad. Because summary judgment was properly granted, we affirm.